## IN THE UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | : | |
| **v.** | : | **CRIMINAL NO. 08-66** |
| **WILLIAM KING, M.D.** | : | |

### GOVERNMENT'S TRIAL MEMORANDUM

The United States of America, by its attorneys, Laurie Magid, Acting United States Attorney for the Eastern District of Pennsylvania, and Bea Witzleben and Maureen McCartney, Assistant United States Attorneys, submits the following trial memorandum.

**I.    Introduction**

Defendant William King stands charged with a 4½-year fraud scheme, thirteen counts of mail fraud, 59 counts of health care fraud, and 10 counts of false statements.  The crimes charged concern the defendant's actions while providing medical services at the Health and Welfare Clinic maintained by and on behalf of the members of the American Federation of State and City Municipal Employees (AFSCME) District Council 33.   District Council 33 is a union that represents the blue-collar workers of the City of Philadelphia.  The Health and Welfare Clinic is located at 3001 Walnut Street in Philadelphia, Pennsylvania.

The indictment alleges that during the period from late 1999 through late 2003, while he was providing gynecological care to the members of the union who went to the Clinic, the defendant committed fraud in his billing of the insurance carrier for District Council 33, which was, at that time, Independence Blue Cross ("IBC" or "Blue Cross").  The indictment alleges that the defendant committed his fraud by: 1) billing for a more expensive service than he actually

provided ("upcoding") and 2) billing for visits that did not occur ("ghost visits"), in violation of 18 U.S.C. §§1341 and 1347. The indictment further alleges that when Blue Cross commenced an audit of the defendant, he then fabricated medical records for 10 patients and supplied those records to the insurance company, in violation of 18 U.S.C. § 1035.

By way of illustrating the fraud scheme, and in order to identify the 10 patients for whom the defendant fabricated records to present to Blue Cross, the indictment identifies, by their initials, 31 former patients of the defendant. This matter is set trial on October 6, 2008. The government estimates that its case will take 8 -10 trial days.

## II.    Overview of the Case

The defendant billed Blue Cross using the required Standard Form 1500, with one 1500 form for each patient visit. That form listed the patient's name and identifying information, the date of service, as well as a code that denoted the service performed (the CPT code). It included a charge for the service. When it received each 1500, Blue Cross's Claims Department determined whether to pay the claim, and if so, at what rate. It also issued a "Statements of Remittance" with each check to the defendant, listing the claims included in the check.

### A.  Upcoding

The government is prepared to prove that during the period charged in the indictment, the defendant generally provided very basic services to patients who visited the Clinic, but instead of using the appropriate "office visit" CPT codes,[1] repeatedly billed for CPT code 99245

---

[1]  "CPT" codes are standard insurance processing codes used to identify certain medical services and procedures. ("CPT" derives from the "Physicians' Current Procedural Terminology," which is published by the American Medical Association). As described by the 2003 AMA Procedural Manual: "CPT is a systematic listing and coding of procedures and services performed by physicians. Each procedure or service is identified with a five digit code. The use

for even the most basic office visit.  Further, he frequently billed for visits that had not occurred.

The CPT code which the defendant used, 99245, denotes a "consultation" of the highest

complexity, and was paid at a rate much higher than the office visit codes.

### 1. Consultation Code 99245

As described by the 1999 Procedure Terminology Manual,[2] a "consultation" is a type of

service provided by a physician whose opinion or advice regarding the evaluation and/or

management of a specific problem is requested by another physician.  A physician consultant

may initiate diagnostic and/or therapeutic services at the same or a subsequent visit.  The request

for a consultation from the attending physician and the need for consultation must be

documented in the patient's medical record.  The consultant's opinion and any services that were

ordered or performed must also be documented in the patient's medical record and communicated

by written report to the requesting physician.

There are four subcategories of consultations: office, initial inpatient, follow-up inpatient,

and confirmatory.  For office (or other outpatient) consultations, new and established patients are

both covered by the same series of codes: 99241-99245.  Within that series of codes, where that

service falls (and may therefore be billed) depends on the levels of history-taking, examination

and medical decision making required for that patient's situation.  As the complexity of the

required history-taking, examination and medical decision making rises, so does the code

number, and the corresponding remuneration.

---

of CPT codes simplifies the reporting of services.  With this coding and recording system, the
procedure or service rendered by the physician is accurately identified."

[2]  A copy of this manual was recovered from the defendant's home.

The 1999 Procedural Terminology Manual describes the lowest-level such consultation code, 99241, as follows:

> Office consultation for a new or established patient, which requires these three key components:
> -a problem focused history;
> -a problem focused examination; and
> -straightforward medical decision making.
> Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.
> Usually, the presenting problem(s) are self limited or minor.  Physicians typically spend fifteen minutes face-to-face with the patient and/or family.

In contrast, code 99245 – the code which the defendant billed IBC almost exclusively – is described as follows:

> Office consultation for a new or established patient, which requires these three key components:
> -a comprehensive history;
> -a comprehensive examination; and
> -medical decision making of high complexity.
> Counseling and/or coordination of care with other providers or agencies are provided consistent with the nature of the problem(s) and the patient's and/or family's needs.
> Usually, the presenting problems(s) are of moderate to high severity.  Physicians typically spend 80 minutes face-to-face with the patient and/or family.

CPT Code 99245 is the highest and most complex consultation code.  The 2003 AMA Procedural Manual  provides the following clinical example of when CPT code 99245 should be used by an OB/GYN:

> -Initial emergency room consultation for a twenty-three year old patient with severe abdominal pain, guarding, febrile, and unstable vital signs.

Based on the Blue Cross data of its payments to Dr. King, this code paid at $94.08 per claim, on average, over the period from October 1999 through November 2003.

4

## 2. **Office visit codes**

The codes used to report evaluation and management services provided in a doctor's office or in an outpatient setting are broken into two categories: "new patient" (codes 99201-99205, depending on the levels of history, exam and medical decision making required) and "established patient" (codes 99211 - 99215, depending on the levels of history, exam and medical decision making required).

The middle code in the category for <u>new</u> patients, 99203, is defined in the 1999 Procedure Terminology Manual as follows:

> -Office or other outpatient visit for the evaluation and management of a new
>  patient, which requires these three key components:
> > -a detailed history;
> > -a detailed examination; and
> > -medical decision making of low complexity.
> Counseling and/or coordination of care with other providers or agencies are
> provided consistent with the nature of the problem(s) and the patient's and/or
> family's needs.
> Usually, the presenting problem(s) are of moderate severity. Physicians typically
> spend 30 minutes face-to-face with the patient and/or family.

The middle code in the category for <u>established</u> patients, 99213,[3] is defined as follows:

> -Office or other outpatient visit for the evaluation and management of an established
>  patient, which requires at least two of these three key components:
> > -an expanded problem focused history;
> > -an expanded problem focused examination;
> > -medical decision making of low complexity.
>
> Counseling and coordination of care with other providers or agencies are provided
> consistent with the nature of the problem(s) and the patient's and/or family's
> needs.
> Usually, the presenting problem(s) are of low to moderate severity. Physicians
> typically spend 15 minutes face-to-face with the patient and/or family.

---

[3] A review of King's files by IBC revealed that a majority of his patients should have been billed using, at most, CPT Code 99213.

Based on the Blue Cross data of its payments to Dr. Urmila Franklin, another Clinic gynecologist who was identically situated to the defendant, and who actually sometimes billed this code, this code (99213) paid at $22.70 per claim, on average, from 2000 through 2003.

The government will introduce evidence that from time to time, Blue Cross sent the defendant letters notifying him of the amounts which Blue Cross would pay for each of the respective codes, as those rates changed over time.   The government will also prove that the defendant received training on the proper billing of the codes, including training on the consultation codes.   Despite this training, the government will also show that the defendant billed for 99245 consultations at a dramatically higher rate than other providers in the Delaware Valley.[4]

IBC records show King was paid $1,020,489.92 as a result of his billing code 99245 between October 19, 1999 and November 21, 2003.[5]   If he had instead billed every visit - other

---

[4] Indeed, IBC records indicate that in 2000, King successfully billed code 99245 in 2,616 instances (for 898 patients that year), while the next highest provider (Temple Ob/Gyn Associates) successfully charged this code in only 89 instances (for 3,045 patients that year). In 2001, King successfully billed code 99245 in 2,957 instances (for 848 patients that year), while the next highest provider – Temple ObGyn Associates – charged for 102 instances (for their total of 2,947 patients).   In 2002, King billed code 99245 in 2,480 instances (for his total 887 patients).   The next highest provider charging 99245 that year charged for 50 instances (for 245 patients).   In 2003, King charged code 99245 in 2,279 instances (for 799 patients.)   As a comparison, the second highest provider charging IBC for code 99245 in 2003 charged for only 87 instances (for 137 patients).   For 2003, IBC allowed King $344,327 for services claimed under code 99245.   That same year, IBC allowed the next highest provider billing under code 99245 approximately $14,625.

[5] In comparison, Dr. Urmila Franklin, who also worked as an ObGyn at Local 33's clinic, did not bill 99245 at all between January 2000 and November 2003.  (Instead she billed a wide range of codes, including all of the various office visit codes for established patients.)

than the first one for that patient - at level 99213, Blue Cross estimates that the defendant would

have been paid approximately $640,000 less during that period.[6]

### B.  IBC's audit of the defendant and the presentation of false records

The government will show that in late 2003 IBC commenced an audit of the defendant

based on the frequency with which he was billing CPT code 99245.  In response to being notified

of the audit, the defendant attempted to stall the auditors, and negotiated to produce substantially

fewer patient records than the auditors at first requested.

In an April 28, 2004, letter to the defendant, IBC's Provider Audit Unit requested access

to the original medical records and original billing records, as well as copies of the same, for

forty specified patients.  The letter called for the files to be ready for review on June 2, 2004.  On

May 21, 2004, Marianne McGinty of IBC called the defendant's office to confirm the IBC visit

on June 2, and spoke to the defendant.  The defendant requested an extension of the audit date,

saying that one member of his staff was on vacation and the other had just had open heart

surgery.   He told McGinty that June 29 would work, and provided her with the name and phone

number of his "officer manager," "Carolyn."[7]  McGinty immediately left a message for Carolyn.

Five days later, Carolyn called McGinty back, saying she was having difficulty determining a

good start time, and would call McGinty back.  On June 2, McGinty called Carolyn again, and

---

[6]  Blue Cross' estimate of loss generously assumes both that: 1) each patient came to the defendant initially as a "consultation"; and 2) that each patient was seen by the defendant for the first time during the period charged in the indictment.  The government's investigation and proof will show that neither of these assumptions which favor the defendant is true.

[7]  Subsequent investigation revealed that Carolyn is the defendant's wife.

Carolyn said that she was having trouble setting up the audit because there was not "room" for the Audit Team, but that she would eventually call McGinty back.

On June 14, 2004, a member of the audit team received a call from the defendant and Carolyn.  Explaining that the billing records were kept "off site," in a place separate from the medical records, the defendant said that he and his "office manager" were finding the request for forty files overwhelming.  (He also did not want to make copies, due to time and expense.)  After much discussion, it was agreed that the defendant would provide copies of ten files (any ten files chosen by the defendant from the original list of forty chosen by IBC) to the auditors on June 29 at 10 a.m.   The defendant was told that a page-by-page comparison of the originals and the copies would be done, and then a full audit of the copies would be done at IBC.

On June 29, 2004, three members of the IBC Provider Audit Department went to the defendant's office at the Clinic to conduct the audit.  There, the defendant and Carolyn showed the auditors what purported to be the medical and billing files for ten patients, and provided copies thereof.  Carolyn also answered questions about the defendant's office and billing process.

The IBC personnel looked through the 10 files presented to them, and quickly noted the pristine nature of the files, which made them suspect that the files were not in fact the original working patient files.[8]  The audit manager then asked the defendant to see any single medical record for any IBC patient who was not among the 10 provided.   The defendant denied IBC

_____

[8]  The IBC audit team was composed of experienced registered nurses.  They noted the absence of requests for consultations from other doctors, and made a chart of the missing dates of service.  In all, one-hundred and fifteen (115) days of service which had been billed to IBC for these ten patients were missing from the files provided on June 29, 2004.  (The vast majority of the missing dates are from the years 2000 and 2001).

access to any other files.  Ultimately, the IBC audit team left, with the provided copies of the ten files.[9]

Shortly thereafter, the IBC Audit team brought IBC fraud investigators into the investigation.  Those investigators reviewed the ten patient files that the Audit team had been provided by the defendant, and noted that each file had numerous 3-page handwritten forms which each purported to document an extensive medical history and physical exam for a billed visit.  They noted oddities in these which undermined their authenticity and, on August 17, 2004, IBC Investigators Michael Ebner and Joseph Britt made an unannounced visit to the defendant at the Clinic.  The investigators eventually got a chance to speak with the defendant,[10] and asked him to provide the patient files for three specific patients:  D.F., A.G. and Ki.W.  The defendant at first resisted, and wanted to tell the investigators which files they should look at (claiming to have saved a particular patient's life) but the investigators persisted, and the defendant eventually

---

[9]  On July 21, 2004, IBC's Audit Team sent the defendant another letter requesting that he provide, by August 3, 2004, the additional thirty records initially requested, as well as the original charts of the ten patients for which copies were provided on June 29.  The defendant's "office manager" (his wife, Carolyn), responded that the defendant could not be ready for an audit until December, and the defendant sent a letter to IBC to the same effect.

[10]  During their conversation with King, King said that all his patient files were kept in his office, that his patients do not need a referral or appointment, that they are free to come in anytime they want, that he was a contracted employee of the union and was to be paid a salary, that he had not received his salary and that "this place owes me money."  He said that he does not collect a co-pay from patients, because he was told not to, and that Keystone paid the union the co-pay.  Asked about his billing process, he said that he gave a list of the names of patients to his "billing manager, Carolyn" and she produced a bill.  (Asked if Carolyn was his wife, he responded: "at this time let's say she is.")  During his time with the investigators, King also implied that there was massive corruption at the Union, and that the investigators should be looking at people "above" him.

provided the files for D.F. and Ki.W.  As to the third patient, A.G., the defendant said that he was unable to locate the file, and that he didn't recognize that patient's name.[11]

The investigators copied the patient visit notes from these files, and noted the lack of documentation in the files of requests by other physicians for advice and opinion from the defendant regarding the patients, as required for a consultation.  They also noted that those two files were completely different in content and appearance from the ten files that were provided by the defendant to the Audit Team on June 29, 2004.  In particular, unlike the files given to the Audit Team, the two files obtained in August showed a single page record for each date of service that was present in the file, rather than the type of 3-page form that had been in the files presented to the Audit Team.

### D.  The defendant's billing procedure and IBC's claims processing

The government's proof at trial will include evidence of the defendant's billing procedure and IBC's claims processing.  The government will show that during the course of his practice at the Clinic, the defendant had the patients complete two "insurance forms" in addition to the medical record for the visit.  The defendant then took these two insurance forms to his home in Baltimore, where they were used to generate the standard form 1500s that are used in the health care industry for billing, and which were required by Blue Cross.[12]  The claim forms were then mailed to IBC, where the Claims Department processed them for payment.

---

[11]  The defendant had billed IBC for providing services to patient A.G. 28 times over the preceding 30-month period.

[12]  The government will show that the defendant's wife solicited assistance from her two daughters in inputting the information for the billing, as well as some of the younger daughter's friends.

Once claims were approved for payments, a "Statement of Remittance" for a series of claims was generated at IBC for each check being sent to the defendant. Such Statements of Remittance list the claims included, whether each claim was allowed or disallowed (and if disallowed, the reason therefor), and the amount being paid as a result of each claim. These documents also list the CPT code billed, and the total amount being remitted for the list of claims included. These Statements, together with a check for the total amount of the allowed claims included, were mailed to the defendant, via U.S. mail, to the address he had designated.[13]

### E. Ghost visits and destruction of medical records

The government will show that in February of 2005, after Blue Cross had referred this matter to the FBI for criminal investigation, federal agents obtained and executed search warrants on the defendant's office at the Clinic and on his home in Baltimore. A large volume of medical records were recovered from the defendant's office, but the recovered records did not include a medical chart for any of the 40 patients whose files Blue Cross had requested to inspect in June of 2004. The records for these 40 patients were also not found at the defendant's home. At the time of the execution of the warrant, the government served a grand jury subpoena for these records upon the defendant, who, through both counsel in Baltimore and counsel in Philadelphia, represented that he did not have those records.

Seized from the defendant's home were a large number of documents, including a large volume of billing records, and several computers. At the time of the search, Carolyn Speights King, the defendant's "biller" and "office manager" during the relevant time, was interviewed by

---

[13] This was a post office box in Maryland that had been rented by the defendant and his wife.

the case agent from the United States Postal Inspection Service concerning the defendant's billing.

Based upon analysis of the billing records obtained from the defendant's home in Baltimore, the medical records seized from the defendant's office, and records obtained by subpoena to the Union, the government will prove that in addition to upcoding visits by charging them as consultations, the defendant also billed for visits that did not occur.

## III.     <u>Essential Elements of the Offenses</u>

### A.     **Mail Fraud**

To establish a violation of 18 U.S.C. § 1341, the government must prove beyond a reasonable doubt that the defendant: (i) knowingly devised or participated in a scheme to defraud or to obtain money or property by materially false or fraudulent pretenses, representations or promises; (ii) acted with the specific intent to defraud; and (iii) in advancing, furthering, or carrying out the scheme, the defendant used the mails, or caused the mails to be used. <u>See</u> <u>United States v. Pharis</u>, 298 F.3d 228, 234 (3d Cir. 2002); <u>United States v. Frey</u>, 42 F.3d 795, 797 (3d Cir. 1994); <u>United States v. Hannigan</u>, 27 F.3d 890, 892 (3d Cir. 1994); <u>United States v. Copple</u>, 24 F.2d 535, 544 (3d Cir. 1994); <u>United States v. Pearlstein</u>, 576 F.2d 531, 534 (3d Cir. 1978).

### B.     **Health Care Fraud**

The health care fraud statute, enacted as part of the Health Insurance Portability and Accountability Act of 1996, Public Law No. 104-191, provides in relevant part:

> Whoever knowingly and willfully executes, or attempts to execute, a scheme or artifice--
> (1) to defraud any health care benefit program; or

(2) to obtain, by means of false or fraudulent pretenses, representations, or promises, any of the money or property owned by, or under the custody or control of, any health care benefit program,

in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 10 years, or both.

To establish a violation of 18 U.S.C. § 1347, the government must prove beyond a reasonable doubt that the defendant (i) knowingly and willfully executed or attempted to execute a scheme to defraud, (ii) a health care benefit program, (iii) in connection with the delivery of or payment for health care benefits, items or services, (iv) by means of material, fraudulent representations.

The term "health care benefit program" means any public or private plan or contract, affecting commerce, under which any medical benefit, item, or service is provided to any individual, and includes any individual or entity who is providing a medical benefit, item, or service for which payment may be made under the plan or contract. 18 U.S.C. § 24(b).

It is not necessary for the government to prove that the health care benefit program suffered a financial loss, or that the intended victim of the fraud was actually defrauded. Nor must the government prove profit by the defendant or, indeed, success of the scheme at all. Furthermore, it is not necessary for the government to prove that each individual component of the scheme was illegal; it is sufficient that the government show that the entire scheme involved fraudulent conduct. United States v. Starr, 816 F.2d 94, 98 (2d Cir. 1987); United States v. Pollack, 534 F.2d 964, 971 (D.C. Cir. 1976).

### C.    False Statements Relating to Health Care Matters

To establish a violation of 18 U.S.C. § 1035,[14] the government must prove beyond a reasonable doubt that the defendant:

(i) knowingly and willfully

(ii) falsified, concealed, or covered up by any trick, scheme, or device a material fact; or made any materially false statements or representations;  or made or used any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry

(iii) in connection with the delivery of or payment for health care benefits, items, or services

(iv) in a matter involving a health care benefit program.

In this case, the government has charged one count of § 1035 for each patient for whom the defendant produced false medical records to IBC.

---

[14]  18 U.S.C. § 1035(a) provides:
a) Whoever, in any matter involving a health care benefit program, knowingly and willfully--
(1) falsifies, conceals, or covers up by any trick, scheme, or device a material fact; or
(2) makes any materially false, fictitious, or fraudulent statements or representa-tions, or makes or uses any materially false writing or document knowing the same to contain any materially false, fictitious, or fraudulent statement or entry, in connection with the delivery of or payment for health care benefits, items, or services, shall be fined under this title or imprisoned not more than 5 years, or both.

IV.    **Overview of the Government's Case-In-Chief**

A.    **Witnesses**

The witnesses the government intends to call in its case-in-chief generally fall into the following categories:

1.    Employees and records custodians of IBC;

2.    Nurses, doctors, medical technicians and records custodians from the Union Clinic;

3.    Former patients of the defendant;

4.    The CPT coder who provided the defendant with training;

5.    Persons who assisted the defendant and his wife with billing;[15]

6.    Federal law enforcement agents and forensic computer examiners; and

7.    A CPT coding expert.

The IBC witnesses will testify about their respective roles in the audit or investigation, and present data and/or records kept in the course of IBC's business, including the billing data from the defendant, how that data compared to other ob/gyns in the Delaware Valley who billed Blue Cross, the contract between IBC and the defendant, the Statements of Remittance and checks sent to the defendant, and the medical and billing records obtained from the defendant during the audit and investigation.   These witnesses will testify, in addition to the information outlined above, that each of the 13 checks charged in the indictment as being in furtherance of the fraud were mailed from the Eastern District of Pennsylvania.

_____

[15]   In pretrial proceedings before the Grand Jury, the defendant's wife invoked the 5th Amendment and declined to testify.  The government has no reason to believe that she will take a different tack at the trial.

The nurses, doctors, medical technicians, records custodians and patients from the Union Clinic called by the government will: 1) authenticate and introduce records kept by the Union Clinic; 2) describe and explain the office procedures in the defendant's office at the Clinic, including authenticating the regularly-kept medical records and the defendant's billing forms, and explaining the roles each type of participant played in the completion of these forms at various times; 3) describe the nature and extent of the medical circumstances of the patients and the amount of time they typically spent with the doctor; 4) describe the defendant's office hours and practice at the Clinic; 5) testify as to the handwriting on various documents (for example, the patients will deny that the handwriting on the forms used to bill "ghost" visits is theirs); and 6) testify as to specific aspects of a patient visit as described in medical or billing records.

The CPT coding trainer will describe the training she provided to the defendant at Temple University and introduce the materials that she provided at that training.

The government expects to call Aliceson and Labrisha King - the defendant's two daughters - as well as Helen Savoy, who assisted in the billing process, to testify about the defendant's billing process in which they participated. They will describe their use of the billing forms which the defendant brought home from his office in order to create the claim forms sent to IBC.

Federal law enforcement agents and forensic computer examiners will testify about their roles in the investigation. They will introduce records seized from the search warrants on the defendant's home and office, and will present summary testimony. In addition, the FBI case agent will testify about his interview of the defendant, during which the defendant, among other things, described why he had chosen to bill CPT Code 99245 for almost all visits. A forensic

examiner from the FBI will testify about the seizure of computers from the defendant's home, the analysis of those computers, and the recovery, from those computers, of the template(s) used for the 3-page forms presented by the defendant to Blue Cross. He will also testify about what date those documents were created and modifed, as reflected in the computer's data.

The CPT coding expert, Connie Coleman, will testify that she has reviewed all of the records for the 31 patients mentioned in the indictment, and that none of the visits billed by the defendant as complex consultations meet the requirements for CPT code 99245.

B.     **Summary Witnesses**

The government contemplates using government employees, including special agents, to testify as summary witnesses in connection with the presentation of much of the evidence described above. Such testimony is properly admitted under F.R.E. 1006 to describe the contents of voluminous writings, recordings or photographs which cannot conveniently be examined in court. United States v. Haidara, 112 F.3d 511 at *2 (4th Cir. 1997) (unpublished). In this case there are numerous records related to the patients whose treatment will be at issue. These documents are voluminous by any definition, and their individual examination in court would, at a minimum, be inconvenient and time-consuming. Thus, summary testimony is both necessary and appropriate under Rule 1006.

Summary testimony is also appropriate under Rule 611(a) if the evidence will aid the jury in ascertaining the truth and will not be overly prejudicial to the defendant. Haidara, 112 F.3d at *2. Here, there will be numerous records and other evidence within the purview of the government agents. As such, they may testify about and summarize that material. United States v. Moore, 997 F.2d 55, 57-59 (5th Cir. 1993). As long as the records summarized are in

evidence, any underlying assumptions are made explicit, and the witness is available for cross-examination, the summary is appropriate.  See id.; see also Haidara, 112 F.3d at *2.

As long as the witness is familiar with the record keeping system used to prepare the documents in issue, he may explain their contents to the jury regardless of whether he personally prepared the underlying business records or is the custodian of those records.  See United States v. Franco, 874 F.2d 1136, 1138 (7th Cir. 1989) (DEA agent without accounting background permitted to explain ledgers based on understanding of how ledgers were created); United States v. Bahena-Cardenas, 411 F.3d 1067 (9th Cir. 2005) (immigration agent testified about contents of warrant of deportation prepared by a different, non-testifying agent).[16]

C.    Summary Charts

The majority of the physical evidence in this case consists of records seized from the defendant's office or home, or subpoenaed from third parties.  The United States intends to introduce into evidence summary charts based on this evidence, which evidence has already been supplied to the defendant in discovery.  (Once the summary charts are finalized, and before the agents testify, the government will provide these charts to the defense).  Under F.R.E. 1006, summary charts are admissible if they are based upon evidence that is: (i) voluminous and (ii) admissible and (iii) available to the opponent.  United States v. Strissel, 920 F.2d 1162, 1163-64 (4th Cir. 1990).  Although much of the evidence underlying the government's summary charts will, in fact, be offered for admission, it is not necessary that all of the evidence depicted in the charts be admitted as long as it is admissible.  See id.

---

[16]    There is, moreover, no Sixth Amendment Confrontation Clause problem because Crawford v. Washington, 541 U.S. 36 (2004), does not apply to business records or public records.  United States v. Cervantes-Flores, 421 F.3d 825, 832 (9th Cir. 2005).

In addition to summaries of voluminous evidence, the government may also rely upon charts or summaries as educational devices. See Pierce v. Ramsey Winch Co, , 753 F.2d 416, 431 (5th Cir. 1985) ("it is critical to distinguish between charts or summaries as evidence and charts or summaries as pedagogical devices"). Under the rules, and even apart from Rule 1006, a trial court "has the discretion to permit the parties to show to the jury charts and other visual aids that summarize or organize testimony or documents that have already been admitted in evidence." Id.

### D.    Medical Records and Patient Privacy

In order to restrict the further dissemination of health information, limit access to such information to those individuals necessary to the defense, and assure the destruction or return of such information when it is no longer needed, and to protect patient identities from unnecessary public disclosure, the government has proposed, by a separate "Motion for Protective Order" certain procedures that would protect the patients' identities but still allow a public and fair trial.

### E.    Use of Comparison Data

At trial the government intends to offer peer comparisons produced by Blue Cross. The peer comparisons will show that the defendant billed the highest level consultation code (CPT code 99245) at a far greater rate than his peers in the Delaware Valley who also billed Blue Cross during a given time period. The peer comparisons are admissible as summary evidence under Rule 1006. In addition, they are admissible irrespective of Rule 1006.

Peer comparisons generated from computer data kept in the ordinary course of business are admissible in criminal health care trials. United States v. Alexander, 748 F 3d. 185, 188 (4th

Cir. 1984); <u>United States v. Alexander</u>, 789 F 2d. 1046, 1049 (4th Cir. 1986); <u>United States v. Weinstock</u>, 153 F 3d. 272, 275-276 (6th Cir. 1998).

In <u>Alexander</u>, the defendant was convicted of mail fraud in connection with his submission of false claims to health care benefit programs.  On appeal, Alexander challenged the sufficiency of the evidence.  In addressing that contention, the Fourth Circuit noted that Blue Cross/Blue Shield had prepared a peer group analysis and presented it in evidence through a representative of the insurer.  The peer group analysis indicated that Alexander ranked first among other gynecologists in performing certain procedures.  The Court also noted that a Medicaid investigator had compiled, and presented into evidence, similar peer group data with similar results.  On appeal, Alexander argued that the district court had abused its discretion in admitting these studies into evidence because of their irrelevance to the counts charged and because of the inability of the Blue Cross/Blue Shield and Medicaid witnesses to answer pertinent questions on cross-examination.  The Fourth Circuit held that the District Court did not abuse its discretion in admitting the peer group analysis.  <u>Alexander</u>, 748 F. 2d at 188.

In <u>Weinstock</u>, the defendant was convicted of mail fraud in connection with a scheme to defraud insurers by filing false claims.  On appeal, Weinstock challenged the government's introduction of physician practice profiles (peer comparisons) generated by one of the insurers, Blue Cross/Blue Shield.  The Blue Cross profile compared the arthrocentesis procedures billed by Weinstock to the arthrocentesis procedures billed by other pediatrists in the same community. In addition, the government had summarized the information in these peer comparisons in several charts that were also admitted into evidence.  <u>Weinstock</u>, 153 F. 3d at 275-276.

The Sixth Circuit concluded that Weinstock's argument against the peer comparisons ultimately went to the weight to be afforded to the evidence rather than its admissibility. Weinstock, 153 F. 3d at 276. The Court concluded that the physician practice profile consisted of data entered in the regular course of the insurer's business. Consequently, the peer comparisons were admissible under F.R.E. 803(6). Id.

In keeping with the holdings in Alexander and Weinstock, the peer comparisons generated by Blue Cross in this case are admissible. The peer comparisons consist of data entered by the health care benefit program in the regular course of business. The data compare the defendant's billings of the highest consultation code (CPT code 99245) to the billing of this code by other local area providers.

**F.    Evidence of Loss or Destruction of Medical Records**

As part of its case in chief, the government will adduce evidence that none of the medical records for the 40 patients whose records Blue Cross sought to audit still existed in February 2005 when the search warrant was executed on the defendant's office.[17] The loss or destruction of those records is a potential violation of law, inasmuch as Pennsylvania law requires medical doctors to maintain medical records for seven years. 49 Pa. Code § 16.95. Nonetheless, the information concerning the absence of these records is inextricably intertwined with the evidence necessary to prosecute this case, and as such is admissible. F.R.E. 401. See also Fed. R. Evid. 402 (Evidence is relevant if it has *any* tendency to make the existence of a fact of consequence more or less probable)(emphasis added). The fact that the defendant removed from his office all

---

[17] The case agents will testify that such records were not in the defendant's home or office, and defense counsel confirmed, in writing in 2005, that the defendant had no records other than those found in his home and office.

of the medical records for the 40 patients Blue Cross wished to review, and that he did not return

those to his office and evidently disposed of or lost those records, tends to show that the

defendant had the intent to obstruct the audit, in furtherance of his scheme to defraud and to

prevent his fraud scheme from being discovered or proven.  As such, this evidence is admissible,

even if it might also constitute a "bad act" or "other crime" of the defendant.[18]  E.g., United

States v. Gibbs, 190 F.3d 188, 217 (3d Cir. 1999)("Rule 404(b), which proscribes the admission

of evidence of other crimes when offered to prove bad character, does not apply to evidence of

uncharged offenses committed by a defendant when those acts are intrinsic to the proof of the

charged offense.")

###    G.    Defendant's Admissions

The FBI case agent interviewed the defendant at the time that the defendant's office was

searched.  The government intends to present evidence of the defendant's statements at trial.[19]

---

[18]  Moreover, even if the defendant's loss or destruction of the records fell under F.R.E. 404(b), it would be admissible in this case.  E.g., United States v. Johnson, 199 F.3d 123, 128 (3d Cir. 1999)("We favor the admission of such evidence, 'if relevant for any other purpose than to show a mere propensity or disposition on the part of the defendant to commit the crime.' United States v. Long, 574 F.2d 761, 766 (3d Cir.), cert. denied, 439 U.S. 985 (1978); see also United States v. Simmons, 679 F.2d 1042, 1050 (3d Cir.1982), cert. denied, 462 U.S. 1134 (1983). Johnson's bad acts were used for a proper purpose that was not substantially outweighed by a risk of unfair prejudice under Fed. R. Evid. 403. 'In weighing the probative value of evidence against the dangers . . . in Rule 403, the general rule is that the balance should be struck in favor of admission.' United States v. Dennis, 625 F.2d 782, 797 (8th Cir. 1980)." (ellipsis in original)); United States v. Jemal, 26 F.3d 1267, 1272 (3d Cir. 1994); United States v. Sampson, 980 F.2d 883, 886 (3d Cir. 1992); United States v. Scarfo, 850 F.2d 1015, 1019 (3d Cir. 1988); see also Huddleston v. United States, 485 U.S. 681, 688-89 (1988).

[19]  In brief summary, the defendant said that he charged CPT code 99245 because he completes a thorough examination of each patient, makes all calls, and personally takes "things" to the lab.  The defendant said that he spends about an hour with each patient (at each visit).  He further stated that he is justified in using 99245 because he goes beyond the patient's complaint to determine the cause of the problem, probing further into the details.  As such, he claimed, his

Moreover, the government intends to introduce statements that the defendant made to the Blue Cross auditors and to the Blue Cross investigators.[20]   In addition, the government plans to introduce, as admissions of the defendant by an authorized person, the letters from the defendants' attorneys in response to the grand jury subpoena for the patient medical files which indicate that the defendant did not have the missing files.  See F.R.E. 801(d)(2)(C); e.g., Hanson v. Waller, 888 F.2d 806, 814 (11th Cir. 1989)(letter from attorney on issue directly related to the litigation admissible).  Further, the government may elicit as admissions by an authorized person and/or an agent, statements made to Blue Cross and federal law enforcement agents by Carolyn Speights King, whom the defendant held out as his "office manager" and "biller."[21]   See F.R.E. 801(d)(2)(C) & 801(d)(2)(D); e.g., United States v. Reilly, 33 F.3d 1396, 1412 (3rd Cir. 1994); United States v. Roe, 670 F.2d 956, 964-5 (11th Cir. 1982)(statements by employee of defendant in scope of duties as employee are nonhearsay and admissible against defendant).

---

patients were not subjected to unnecessary surgeries, such as those which other doctors involved with the Union performed.  (He would not provide the names of doctors who allegedly performed unnecessary surgeries).  The defendant added that he diagnosed patients with AIDS all the time, and said that he averaged 5-6 patients per day.  He also said that although it was possible that he billed for 20 patients in a day, he did not recall doing so.

[20]   In brief summary, the defendant told the investigators that all of his patient files were kept in his office, that his patients do not need a referral or appointment, that they are free to come in anytime they want, and that some patients came in just to get leave from work and that he accomodated them by seeing them.  He also said that the Union/Clinic  "owes me money," and that he did not collect a co-pay from patients, because he was told not to.

[21]   In these interviews, in brief summary, Mrs. King said the defendant provided her with billing information for the patient visits, and she filled out the 1500 forms.  She said that she and the defendant had used a "manual" to decide which code to use, and that they had decided to use 99245 because the defendant spent so much time with each patient.

**V.**     **Defense Use of Agents' Reports to Cross-Examine Witnesses**

The government in this case has provided to the defense an abundance of reports of

witness interviews by government agents.  To the extent that the agents who prepared the reports

testify, those reports, if materially inconsistent, provide an appropriate basis for impeachment of

the agents.  However, under the Federal Rules of Evidence, those reports may not be used to

impeach the subject of the underlying interview, unless the subject has somehow adopted those

reports.  United States v. Almonte, 956 F.2d 27, 29 (2d Cir. 1992).  For example, unless a

witness - such as a patient or a nurse in this case - has previously seen the FBI agent's summary

of her interview and has previously "adopted" that summary by agreeing that it is complete and

accurate - such as by signing it - that summary of interview cannot be used to impeach that

witness.

In Almonte, a DEA agent testified at trial about the post-arrest statements that he had

obtained from two defendants who were being tried.  Id. at 28.  One defendant sought to cross-

examine the agent with interview notes taken by an Assistant U.S. Attorney who had interviewed

the agent.  Id. at 28-29.  The district court rejected the effort and the Second Circuit affirmed,

holding that the AUSA's notes were not the agent's statement, but merely a "third party's

characterization" of the agent's statement, and therefore irrelevant to impeachment and

consequently inadmissible:

> We have held, however, that a "third party's characterization" of a witness's
> statement does not constitute a prior statement of that witness unless the witness
> has subscribed to that characterization.  . . .  Thus, in the absence of endorsement
> by the witness, a third party's notes of a witness's statement may not be admitted
> as a prior inconsistent statement unless they are a verbatim transcript of the
> witness's own words.  The problem, in essence, is one of relevancy.  If a third
> party's notes reflect only that note-taker's summary characterization of a witness's

24

prior statement, then the notes are irrelevant as an impeaching prior inconsistent statement, and thus inadmissible.

Id. at 29 (citation omitted).

As a matter of evidence, the burden "of proving that notes reflect the witness's own words rather than the note-taker's characterization falls on the party seeking to introduce the notes."  Id.  Thus, a party seeking to use a report to impeach bears the burden of proving a rational basis for concluding that the report either was adopted by witness or represents the verbatim transcript of the witness' statement.  See id. at 30.  In the absence of such proof, cross-examination from such reports or notes should be disallowed.  See also United States v. Shoenborn, 4 F.3d 1424, 1427-28 and n.3 (7th Cir. 1993).  In this case, the defendant should not be permitted to use interview summary reports to cross-examine the underlying subjects of those interviews.

## VI.  Defense Use of Statements Made by the Defendant

The government in this case will present a variety of evidence as admissions of a party opponent under F.R.E. 801(d)(2).  Such evidence is, by definition, not hearsay as to that party.  F.R.E. 801(d).  Thus, for example, emails may be admitted against the party who wrote them, United States v. Siddiqui, 235 F.3d 1318, 1323 (11th Cir. 2000), and confessions may be admitted against the party who gave them.  United States v. McDaniel, 398 F.3d 540, 545 (6th Cir. 2005).  Such statements, however, may not be admitted by the party who gave them, because Rule 801(d)(2) does not allow a party to "to introduce his or her *own* statements through the testimony of other witnesses."  Id.  (italics in original).  Indeed, if such statements were admissible, "parties could effectuate an end-run around the adversarial process by, in effect,

testifying without swearing an oath, facing cross-examination, or being subjected to first-hand scrutiny by the jury." Id.

In this case, the defendant made statements to representatives from Blue Cross and to federal agents, and some of these statements will be introduced by the government. This does not mean that the defendant will be able to likewise.  It does not matter whether the information the party seeks to admit is inculpatory or exculpatory.  In either case, a party simply cannot admit his or her own statements as admissions of a party opponent. United States v. Kapp, 781 F.2d 1008 (3d Cir. 1986) (upholding ruling that tape recording of a conversation between a codefendant and a government informant, which defendant considered exculpatory on the issue of his knowledge of illegality, was inadmissible because it was not offered "against a party" as required by Rule 801(d)(2)).  McDaniel, 398 F.3d 545, n.2.  That rule should be followed here.

**VII.    Stipulations**

The government has proposed stipulations to the defense in the hope of streamlining the evidence at trial, but has not yet heard back about the defendant's position thereon.

> Respectfully submitted,
>
> LAURIE MAGID
> Acting United States Attorney
>
> CATHERINE VOTAW
> Assistant United States Attorney
> Chief, Health Care Fraud
>
>
> _____
> BEA WITZLEBEN
> MAUREEN MCCARTNEY
> Assistant United States Attorneys

## CERTIFICATE OF SERVICE

I hereby certify that I have caused the Government's Trial Memorandum to be
electronically filed and served upon:


Terry Pugh, Esquire
Gerald Ingram, Esquire
1315 Walnut Street
Suite 800
Philadelphia, PA 19107

 

 

 

BEA L. WITZLEBEN
Assistant United States Attorney


Date: _September _____, 2008